IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs June 2, 2015

STATE OF TENNESSEE v. ANTHONY BAYMAN

Direct Appeal from the Criminal Court for Shelby County
No. 11-06593     Chris Craft, Judge

No. W2014-01537-CCA-R3-CD  -  Filed August 17, 2015

A Shelby County jury convicted the Defendant, Anthony Bayman, of second degree murder, and the trial court sentenced him to thirty-two years in the Tennessee Department of Correction.  On appeal, the Defendant contends that the evidence is insufficient to sustain his conviction because the evidence supported a conviction for the lesser-included offense of voluntary manslaughter rather than second degree murder.  After a thorough review of the record and applicable authorities, we affirm the trial court's judgment.

Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed

ROBERT W. WEDEMEYER, J., delivered the opinion of the Court, in which D. KELLY THOMAS, JR., and ROBERT L. HOLLOWAY, JR., JJ., joined.

Michael R. Working, Memphis, Tennessee (on appeal); Stephen C. Bush, District Public Defender, Robert T. Hall, Assistant Public Defender (at trial); Jim N. Hale, Jr., Assistant Public Defender (at sentencing), for the appellant, Anthony Bayman.

Herbert H. Slatery III, Attorney General and Reporter; David H. Findley, Senior Counsel; Amy P. Weirich, District Attorney General; and Chris Lareau, Assistant District Attorney General, for the appellee, State of Tennessee.

OPINION
I. Facts

This case arises from the shooting death of the victim, Melvin Ray.  For this killing, a Shelby County grand jury indicted the Defendant for one count of second degree murder.  At his trial on this charge, the following evidence was presented:  Sharon Ray, the victim's mother, testified that he was thirty when he was killed by a gunshot wound to his head on May 4, 2011.

Darium Moore, the Defendant's nephew, testified that on May 4, 2011, he lived with his mother and little sister in a house located at 284 Bond Street. He recalled that he was at his house that evening watching sports on television. His mother, his sister, the Defendant and the victim, whom he knew as "Little Melvin," were there also. Everyone was drinking that evening, and the Defendant cut the victim's hair for him. Mr. Moore recalled seeing the victim with an automatic weapon, and he said that the victim put the gun under the couch at around 11:00 p.m.

Mr. Moore testified that, at around 1:00 a.m., he was in his room preparing for sleep when he heard gunshots, specifically one gunshot followed by about "three . . . or four more." He said that he "jumped up" and went to the door of his bedroom. He saw the Defendant standing in the living room with the front door wide open. The Defendant was firing an automatic weapon outside the front door. Mr. Moore testified that, after firing the shots, the Defendant left the house.

Mr. Moore said that, after the Defendant left, he went to a back bedroom and got his mother and sister and took them out of the back of the house. They went to a nearby gas station where his mother called the police and then called his aunt to come and pick them up. Mr. Moore said that he, his mother, and his sister returned to the house after police had arrived. Mr. Moore went to the police station, where he identified the Defendant from a photographic lineup.

During cross-examination, Mr. Moore testified that he told the police after the shooting that, because he had not seen the Defendant carry a weapon before, he believed that the weapon the Defendant fired belonged to the victim. Mr. Moore had seen the victim carry a gun on a previous occasion. Mr. Moore said that the Defendant had previously cut hair at his mother's home.

Vanessa Bayman, the Defendant's sister, testified that she had known the victim for a few months before his death. She said that, on the evening of his death, she invited him to her house to get a haircut. The Defendant, she explained, would sometimes come to her house to cut hair. The victim had gotten his hair cut at her home on one or two previous occasions. The Defendant told her that, if she saw the victim that evening, she should tell the victim to come have his hair cut by the Defendant. Ms. Bayman said that she saw the victim later while she was on her way to the store, and she told him that the Defendant was cutting hair at her house and that he should go have his hair cut.

Ms. Bayman said that, when she returned to her house and while people came in and out of the house to have their hair cut, those present at the home watched a basketball game. There were multiple people going in and out of the house that evening who were coming to socialize, get their haircut, or watch the game. Ms. Bayman said that she and

2

her visitors were drinking alcohol.  Ms. Bayman recalled that when she left the group to go to her bedroom for the night, no one appeared to be upset.

Ms. Bayman testified that, after falling asleep, Mr. Moore woke her to tell her that the Defendant had just shot the victim.  Ms. Bayman said that she went to her living room and found the Defendant outside.  The Defendant came back inside the house, and Ms. Bayman asked him what he had done.  The Defendant said that "Little Melvin shouldn't play with [him]," and then he ran out of the door.  Ms. Bayman said she "panicked," woke up her daughter, and left the house with her children.

Dr. Miguel Laboy, a Shelby County forensic pathologist, testified that he conducted the autopsy on the victim's body.  He said that the victim had suffered a gunshot wound to his head from an "intermediate range."  Dr. Laboy said that the bullet penetrated the victim's brain, causing a hemorrhage on the scalp area above the victim's skull.  The victim's orbital bone was fractured, and he had contusions to his temporal lobe.  The victim's blood alcohol content at the time of his death was .277, what Dr. Laboy described as a "toxic level."  There was also the presence of marijuana in his blood stream.

James Walton, an officer with the Memphis Police Department, testified that he responded to a call from 284 Bond Street.  He said that the police had received a call about a shooting or suicide from that address.  When he arrived, the front door to the residence was locked.  He looked through the front window and saw a body lying in a pool of blood in the front room.  Officer Walton found the back door open, and he entered the home.  He and other officers secured the crime scene and interviewed witnesses.  Officer Walton recounted that he spoke with the son and daughter of Ms. Bayman, who was the original caller.

Justin Sheriff, an officer with the Memphis Police Department, testified that he processed the scene as a crime scene investigator.  He offered photographs that he had taken at the scene.  He showed the jury pictures of the house and of the victim's body as it was found at the scene.  Officer Sheriff recalled that officers found marijuana and cocaine in the victim's pants pockets.  Officer Sheriff also drew sketches of the crime scene that he showed to the jury.

Officer Sheriff testified that he found a shell casing near the victim's body on the carpet inside the home.  The officer also found four spent bullet casings outside in the front yard by the porch.  The officer opined that the shell casings were from a .40 caliber handgun, which discharges its shell casings to the right of the weapon when fired.

3

Isreal Taylor, a sergeant with the Memphis Police Department, testified that he was a homicide investigator and was assigned to this case the morning after the shooting. He said that he became aware that Mr. Moore and Ms. Bayman had given statements indicating that the Defendant had shot the victim. Sergeant Taylor notified the victim's family of his death and attempted to gather information about the Defendant's whereabouts. He and another officer, Sergeant Mundy Quinn, looked at various locations for the Defendant and informed people that they saw to tell the Defendant that they were looking for him. Sergeant Taylor testified that the Defendant called the police and turned himself in to police custody.

Shun Robertson testified that he was forty years old and grew up in Chicago, Illinois. At the time of this shooting he resided in Memphis, Tennessee. He had since moved back to Chicago to care for his ten-year-old daughter. Mr. Robertson said that he had graduated from high school while in Chicago and had received his bachelor's degree in Food and Beverage Management, and was working in that industry at the time of trial. In May 2011, Mr. Robertson was a bartender at the Holiday Inn Airport in Memphis.

Mr. Robertson said that he did not know the Defendant but that he was friends with the victim. Mr. Robertson recounted the events leading up to the shooting. Mr. Robertson said that he had been in contact with the victim that day, in part because the victim was supposed to come to Mr. Robertson's place of work. Mr. Robertson recounted that the victim had been at the Defendant's house all day, getting his hair cut and watching football. Mr. Robertson said that, after he stopped working for the evening, he went to the house where the Defendant was located. Mr. Robertson said that, when he approached the house, he heard arguing. He saw the victim leaving the house, and he heard the victim say that the victim had left something at the house. The victim asked the Defendant if he could go inside the house to see if he could find it. The Defendant denied his request, and the two exchanged angry words. Mr. Robertson recalled that the victim appeared intoxicated, as indicated by his slurred speech. During the argument, there were other men present, one who was around six feet six or seven inches tall, and another man with the victim. Mr. Robertson said that he and the "tall man" present were trying to get the victim to leave while the third man encouraged the victim to enter the home.

Mr. Robertson said that the Defendant turned and went into his house, and he and the victim turned to walk away. Mr. Robertson said that he and the victim walked "two or three steps" before the victim turned and walked back to the porch. When he got to the porch, the victim raised his hand to the open door, and Mr. Robertson walked up the steps, standing behind the victim. The door opened, the victim moved to the left, and Mr. Robertson saw a gun in his face. He noted that the Defendant was holding the gun in his left hand, and that the weapon was an automatic weapon. Mr. Robertson said that he

4

turned and began running, and he heard one gunshot. He turned to run down the side of the house and felt two gunshots come past him. He then ran toward a brick wall, jumped over it, and then heard four more shots. Mr. Robertson said that, after he ran a bit farther, he called the victim's sister to see if the victim had escaped the shooting. He saw police responding to the scene, so he walked back toward the house. When he arrived, he informed the police that he had been present at the shooting, and he went to the police station to give a statement.

During cross-examination, Mr. Robertson testified that he never entered the home where the Defendant was located. He said that he did not stay to check on the victim after the shots were fired. Mr. Robertson conceded he was unable to identify anyone from a photo spread shown to him by the police.

The Defendant testified that, on May 4, 2011, he was at his sister's house on Bond Street, where she lived with her children, Dominique and Mr. Moore. He said that he stayed there occasionally. That day, he gave haircuts to several people, including the victim. The Defendant agreed that those present at the house that day were drinking and watching television, and he participated in these activities. During the day, the victim did not appear intoxicated to him. When the Defendant began to cut the victim's hair, the victim stood up, pulled a gun out of his waistband, and put it under the cape for the haircut, and then sat back down. After the victim received his haircut, he paid the Defendant $10. The Defendant admitted that he had previously been a "drug dealer" but that he had ceased doing so and began cutting hair for income. He noted that, during his days as a drug dealer, he had been convicted of theft of property valued over $10,000.

The Defendant testified that, later that evening when the "altercation" occurred, the victim appeared to be intoxicated. The Defendant said that he and the victim were outside at some point, and the victim grabbed his shirt. The Defendant said that he tried to get the victim to let him go, and, when he was finally successful, he went into the house and closed the door. The victim pursued him and knocked on the house door. The Defendant said he asked the victim, "What the F are you doing?" The victim grabbed him and tried to push his way into the house. The two men struggled in the doorway for a few seconds. The Defendant noted that he was aware that the victim was armed, so he attempted to disarm him. He reached for the victim's gun, having seen him put it in his waistband after the haircut, and he took hold of the weapon.

The Defendant testified that "in the heat of that moment" he discharged the weapon. He said that, after he fired the gun, he "ran off and left the gun." The Defendant explained that he ran because he had never been "in that situation before." He stated that he turned himself in to police custody and had cooperated with them and accepted responsibility for firing the weapon. It was his position, however, that he acted

in self-defense. The Defendant offered his sympathy to the victim's sister and mother who were present in the courtroom.

During cross-examination, the Defendant agreed that he and the other people present that evening had also been using cocaine. He said that he offered a statement to police when he was arrested. In his statement he said that he shot the gun only one time. He said that he tried to give an honest statement but that he was intoxicated. He agreed the evidence showed that he fired the weapon more than once. The Defendant agreed that his statement to police also did not include the fact that the victim had returned to the house door and knocked on it twice. The Defendant agreed that he also told police that he was the closest to the door because he was "opening the door for [the victim] to leave." He explained that, at the time of his statement, he could not remember exactly what had happened but just knew that they had struggled in the doorway. The Defendant maintained that he dropped the gun and said that he did not know why police did not find it. The Defendant said that he did not recall anyone being with the victim that evening and that he did not recall firing four more shots.

During redirect examination, the Defendant testified that he told the police that he was responsible for shooting the victim. He told them that the gun belonged to the victim and that he wished it had never happened. The Defendant told police that he was sorry for the shooting.

Mr. Robertson was recalled, and he testified that he would have heard it if the victim had knocked on the door to the house. He said that he never saw the victim touch the Defendant, and he never saw the two engage in a physical altercation of any kind. Mr. Robertson said that he also had been "tussling" with the victim that night, and he never felt a weapon of any kind in his waistband.

Based upon this evidence, the jury convicted the Defendant of second degree murder. The trial court found that the Defendant was a Multiple Offender and imposed a sentence of thirty-two years.

## II. Analysis

On appeal, the Defendant contends that the evidence is insufficient to sustain his conviction. He asserts that the evidence supports only a verdict of the lesser-included offense of voluntary manslaughter. He contends that the State failed to carry its burden to prove that the killing was free from excitement that would cause a reasonable person to act in an unreasonable manner. The State counters that the jury was entitled to reject the Defendant's version of events and accredit the State's proof that the Defendant

knowingly shot the victim and that the evidence, therefore, supports his conviction. We agree with the State.

When an accused challenges the sufficiency of the evidence, this Court's standard of review is whether, after considering the evidence in the light most favorable to the State, "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see* Tenn. R. App. P. 13(e), *State v. Goodwin*, 143 S.W.3d 771, 775 (Tenn. 2004) (citing *State v. Reid*, 91 S.W.3d 247, 276 (Tenn. 2002)). This rule applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence. *State v. Pendergrass*, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999). In the absence of direct evidence, a criminal offense may be established exclusively by circumstantial evidence. *Duchac v. State*, 505 S.W.2d 237, 241 (Tenn. 1973). The jury decides the weight to be given to circumstantial evidence, and "[t]he inferences to be drawn from such evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence, are questions primarily for the jury." *State v. Rice*, 184 S.W.3d 646, 662 (Tenn. 2006) (citations omitted). "The standard of review [for sufficiency of the evidence] is the same whether the conviction is based upon direct or circumstantial evidence." *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)).

In determining the sufficiency of the evidence, this Court should not re-weigh or reevaluate the evidence. *State v. Matthews*, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). Nor may this Court substitute its inferences for those drawn by the trier of fact from the evidence. *State v. Buggs*, 995 S.W.2d 102, 105 (Tenn. 1999); *Liakas v. State*, 286 S.W.2d 856, 859 (Tenn. 1956). "Questions concerning the credibility of the witnesses, the weight and value of the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact." *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997); *Liakas*, 286 S.W.2d at 859. "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978); *State v. Grace*, 493 S.W.2d 474, 479 (Tenn. 1973). The Tennessee Supreme Court stated the rationale for this rule:

> This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

*Bolin v. State*, 405 S.W.2d 768, 771 (Tenn. 1996) (citing *Carroll v. State*, 370 S.W.2d 523 (Tenn. 1963)). This Court must afford the State of Tennessee the strongest legitimate view of the evidence contained in the record, as well as all reasonable inferences which may be drawn from the evidence. *Goodwin*, 143 S.W.3d at 775 (citing *State v. Smith*, 24 S.W.3d 274, 279 (Tenn. 2000)). Because a verdict of guilt against a defendant removes the presumption of innocence and raises a presumption of guilt, the convicted criminal defendant bears the burden of showing that the evidence was legally insufficient to sustain a guilty verdict. *State v. Carruthers*, 35 S.W.3d 516, 557-58 (Tenn. 2000).

In this case, the jury convicted the Defendant of second degree murder. As charged in this case, "[s]econd degree murder is . . . [a] knowing killing of another." T.C.A. § 39-13-210 (2014). "A person acts knowingly with respect to a result of the person's conduct when the person is aware that the conduct is reasonably certain to cause the result." T.C.A. § 39-11-302(b). "To establish that a defendant committed a second degree murder, the State has the burden of proving beyond a reasonable doubt that (1) the defendant killed the victim, and (2) the defendant committed the killing with a 'knowing' state of mind." *State v. Parker*, 350 S.W.3d 883, 904 (Tenn. 2011). Furthermore, "[a] person can act knowingly irrespective of his or her desire that the conduct or result will occur." *State v. Gray*, 960 S.W.2d 598, 604 (Tenn. Crim. App. 1997) (citing *State v. Rutherford*, 876 S.W.2d 118, 120 (Tenn. Crim. App. 1993)). Voluntary manslaughter is "the intentional or knowing killing of another in a state of passion produced by adequate provocation sufficient to lead a reasonable person to act in an irrational manner." T.C.A. § 39-13-211(a).

The evidence, viewed in the light most favorable to the State, proved that the Defendant cut the victim's hair on the evening of the shooting. Both men had been drinking, and may have used cocaine. The victim left the home and then returned in an attempt to retrieve something that he had left behind. He and the Defendant engaged in a verbal altercation, and the Defendant refused him entrance into the house. The victim turned to walk away, and the Defendant went inside the house. The victim walked onto the porch, accompanied by Mr. Robertson, and, before he got to the front door, the Defendant opened the door and fired a gun, shooting the victim. The Defendant fired the weapon at least four more times. The Defendant dropped the weapon and fled. He later turned himself into police.

This Court has held that pointing a gun at someone and discharging it is sufficient to sustain the "knowing" element of second degree murder. *State v. Randy Ray Ramsey*, No. E2013-01951-CCA-R3-CD, 2014 WL 5481327, at *6-7 (Tenn. Crim. App., at Knoxville, Oct. 29, 2014), *perm. app. denied* (Tenn. Jan. 16, 2015). Further, the

Defendant pointed the gun and fired not once, but at least five times, further supporting that he acted knowingly because he was aware that his conduct was reasonably certain to cause the result.

While the Defendant claims that he took the gun from the victim during a physical confrontation and then discharged the weapon while in a state of excitement, the jury chose to reject this argument, accrediting instead the testimony of the State's witnesses. Determining which version (if either) to believe and determining what constitutes adequate provocation are questions for the jury. *State v. Johnson*, 909 S .W.2d 461, 464 (Tenn. Crim. App. 1995). We conclude that the evidence sufficiently supports the Defendant's conviction for second degree murder, and he is not entitled to relief.

### III. Conclusion

Based on the aforementioned reasoning and authorities, we affirm the judgment of the trial court.

_____
ROBERT W. WEDEMEYER, JUDGE